UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------- X
                                   :

VESTCHAIN LLC, MICHAEL MALONEY,      :
JEFFREY PARKET, ROSS PARKET and       :
MARC FRIEDFERTIG,                      :   **Index No.**
                                     :
                                     :
                    Plaintiffs,     :   **COMPLAINT**
      - against-                        :
                                     :
OPSKINS GROUP INC. dba WORLDWIDE    :
ASSET EXCHANGE and MALCOLM        :
CASSELLE,                              :
                                     :
                  Defendants.    :
--------------------------------------------------------- X

       Plaintiffs VestChain LLC ("VestChain"), Michael Maloney, Jeffrey Parket, Ross Parket

and Marc Friedfertig (collectively, "Plaintiffs"),[1] by and through their attorneys, hereby file this

Complaint against Defendants OPSkins Group Inc. dba Worldwide Asset Exchange ("WAX")

and Malcolm CasSelle ("CasSelle") (WAX and CasSelle, collectively, Defendants). and allege as

follows:

<u>**NATURE OF THIS ACTION**</u>

       1.     This is an action for breach of contract, unjust enrichment, quantum meruit and

fraud.  Maloney had and has substantial experience in the cryptocurrency and blockchain

industries.

---

[1] VestChain is no longer an active entity, but the Plaintiffs bring this action in an effort to wind up the company's affairs in accordance with NY L.L.C. § 703(b) ("the persons winding up the limited liability company's affairs may, in the name of and for and on behalf of the limited liability company, prosecute and defend suits, whether civil, criminal or administrative.").  See Sands Harbor Marina Corp. v. Wells Fargo Insurance Services of Oregon, Inc., 156 F.Supp.3d 348 (E.D.N.Y. 2016); Paradise Creations, Inc. v. UV Sales, Inc., 315 F.3d 1304, 1307-08 (Fed.Cir.2003).  The individual Plaintiffs are the members of VestChain.  Defendant Maloney was the VestChain point of contact with WAX and CasSalle, but this action is being brought in the name of all of the VestChain members to preempt any challenge that the Plaintiffs lack standing to assert their claims.

2.      Defendants WAX and CasSelle engaged Plaintiffs to provide advisory services in connection with Defendants' operations in the cryptocurrency and blockchain industries, but Defendants have not compensated and have refused to compensate Plaintiffs in accordance with their agreement.

3.      Defendants describe WAX – or Worldwide Asset eXchange – as "a decentralized platform that enables anyone to operate a fully functioning virtual marketplace with zero investment in security, infrastructure, or payment processing.  Developed by the founders of OPSkins, the world's leading marketplace for online video game assets, WAX is designed to serve the 400+ million online players who already collect, buy and sell in-game items."

4.      Defendants further describe "WAX Tokens," which are also at issue in this case, as follows: "Harnessing the power of blockchain technology, WAX Tokens are utility tokens that allow virtual goods - and not just for use in video games - to easily be tokenized and exchanged for cryptocurrency. The smart contract underlying the transaction acts as the mechanism that permits trustless trading between buyers and sellers. The WAX Platform will allow millions of traders to create their own virtual stores on one decentralized platform, providing instant payments, security, and trust services that will bring millions of new participants into a growing ecosystem."

5.      WAX Tokens are WAX's own virtual currency.  The price of WAX Tokens has ranged in value between a low of approximately $0.12 per token and a high of approximately $1.25 per token since they began trading a few months ago.

6.      WAX and/or CasSelle hired VestChain and/or Maloney to perform certain services, and to compensate them with a combination of cash and WAX Tokens.

7.      VestChain and Maloney performed the services in accordance with the parties'

agreement, and in reliance on the parties' agreement, and sent Defendants invoices for each of the first two months of work.  CasSelle approved the first invoice in writing and instructed Plaintiffs to continue to provide the services, but Defendants have never paid – and they refuse to pay – anything close to what is owed on either invoice.[2]

## THE PARTIES

8.      Plaintiff VestChain LLC is a Delaware Limited Liability Company with its principal place of business at 717 East 5th Street, Suite 4A, New York, New York 10009.  Its members are Plaintiffs Michael Maloney, Jeffrey Parket, Ross Parket and Marc Friedfertig.  VestChain has been dissolved, but its members continue to work together to wind up its affairs.

9.      Plaintiff Michael Maloney is a member of VestChain and an individual residing in New York.

10.     Plaintiffs Jeffrey Parket, Ross Parket and Marc Friedfertig are individuals and members of VestChain, residing in New York, New York and New Jersey, respectively.

11.     Defendant OPSkins Group Inc. dba Worldwide Asset eXchange is a Canadian Company with the registered address of 1200 McGill College Avenue, Montréal, Québec, H3B4G71207 Canada.   The company operates out of office located at 1207 4th Street, Suite 400B, Santa Monica, California 90401.

12.     Defendant Malcolm CasSelle is an individual residing in California.  He is the President of WAX and the Chief Information Officer of OPSkins Group Inc.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there exists complete diversity of citizenship between each of the Plaintiffs and each of the

---

[2] As discussed herein, Defendants paid the cash portion of the First Invoice, but have not paid – and have refused to pay – the cash portion of the Second Invoice or the WAX Tokens portions of either invoice.

Defendants, and because the amount in controversy exceeds the jurisdiction requirement exclusive of costs and interest.

14.     Venue in this district is proper because VestChain, Maloney, Jeffrey Parket and Ross Parket reside in the district, and because Defendants do business in this state and have transacted business in this state out of which the controversy arose.

## BACKGROUND FACTS

15.     In 2017, Maloney, Jeffrey Parket, Ross Parket and Friedfertig agreed to form a company to provide consulting services to the emerging blockchain and cryptocurrency industry. The four individual Plaintiffs began seeking and entering into agreements with customers on behalf of the company even before the formal incorporation of VestChain.

16.     In August 2017, WAX and CasSelle (President of WAX and CIO of Opskins) entered into a services agreement with Maloney (the "WAX Agreement").  Under the WAX Agreement, Maloney agreed to provide services to WAX and CasSelle, and they agreed to pay Maloney a combination of cash and WAX Tokens for each hour that he worked.  Although written drafts of the WAX Agreement were prepared, Plaintiffs do not have a fully-executed copy of a written WAX Agreement.  Notwithstanding the possible lack of a written agreement, Maloney/VestChain and CasSelle/WAX reached an agreement, and Maloney performed in accordance with that agreement.

17.     VestChain was formally incorporated as a Delaware Limited Liability Company in September 2017, and Maloney agreed that VestChain and its members would receive the financial benefit of the WAX Agreement.

18.     The WAX Agreement had a one-year term, and allowed either party to terminate the agreement without cause upon 60 days' prior notice to the other party.  Neither party ever formally terminated the WAX Agreement.

19.     In accordance with the WAX Agreement, Maloney provided 108 hours of work to WAX during the period August 28-September 30, 2017, and 82 hours of work to WAX during the period October 1-31, 2017.

20.      Also in accordance with the WAX Agreement, WAX named Maloney to their Advisory Board, as reflected in numerous press releases and press statements made by WAX. An example is attached hereto as **Exhibit A** and incorporated herein.

21.     On October 3, 2017, Plaintiffs issued an invoice to Defendants pursuant to the WAX Agreement for the 108 hours of work performed through September 30, 2017 (the "First Invoice"). A copy of the First Invoice is attached hereto as **Exhibit B** and incorporated herein. Plaintiffs invoiced Defendants for $27,000 in cash and 753,843.54 in WAX Tokens. The First Invoice was issued on VestChain letterhead, referencing Maloney as CEO of VestChain. It was addressed to CasSelle's attention at WAX in Santa Monica, California.

22.     On October 4, 2017, Maloney emailed the First Invoice to CasSelle. In the cover email Maloney wrote: "Hi Malcolm. Please see attached an invoice for advisory services related to the WAX white paper and token sale for August 28th through September 30th, 2017. Please let me know if you have any questions or comments on the invoice." A copy of this email is attached hereto as **Exhibit C** and incorporated herein.

23.     Defendants knew – no later than the date they received the First Invoice, but upon information and belief earlier than that – that Maloney was CEO of VestChain, and that he was providing services to Defendants through VestChain.

24.     Later on October 4, 2017, CasSelle responded to Maloney's email, copying his colleague Jason Seldon, writing: "Michael. Pls note that these tokens are locked up for 6 months

due to the discount. See attached TOS."  A copy of this email is attached hereto as **Exhibit D** and incorporated herein.

25.	On October 9, 2017, CasSelle responded again to Maloney's October 4 email, again copying Seldon, writing "Thank you approved." A copy of this email is attached hereto as **Exhibit E** and incorporated herein.

26.	Maloney and VestChain continued thereafter to provide services to WAX and CasSelle in accordance with the WAX Agreement.

27.	On November 15, 2017, Plaintiffs issued another invoice to Defendants under the terms of the WAX Agreement for the 82 hours of work performed through October 31, 2017 (the "Second Invoice").  The Second Invoice, like the First Invoice, was issued on VestChain letterhead to WAX in Santa Monica, California, referencing Maloney for VestChain and CasSelle for WAX.  A copy of that invoice is attached hereto as **Exhibit F** and incorporated herein.  It reflects charges to Defendants for $22,983.43 in cash and 445,057 in WAX Tokens.

28.	On December 18, 2017, WAX publicly announced that when it issued its tokens, it would be doing so based on a 10:1 split: "When WAX Tokens are issued beginning this week, all contributors will receive 10x the number of tokens they purchased. So for example if you purchased WAX during the Main Sale at the price of 150 WAX per 1 ETH, you'll receive 1500 WAX per 1 ETH instead. If you purchased during the Pre-Sale, you'll get 3000 WAX per 1 ETH."  A copy of this announcement is attached hereto as **Exhibit G** and incorporated herein.

29.	In accordance with WAX's announced 10:1 split of WAX Tokens, Defendants are obligated to pay Plaintiffs 7,538,435.4 WAX Tokens under the First Invoice and 4,450,570 WAX Tokens under the Second Invoice, for a total of 11,989,005.40 WAX Tokens under the two invoices.

30.     As noted above, on October 9, 2017, CasSelle approved the entirety of the First Invoice in writing, and made specific reference to the WAX Tokens portion a few days earlier on October 4.  See **Exhibits D & E**.

31.     In December 2017, CasSelle confirmed to Maloney by telephone that Defendants would honor the entirety of the First Invoice, although they wished to negotiate a compromise with respect to the Second Invoice.

32.     CasSelle explained that the reason WAX wished to negotiate a compromise with respect to the Second Invoice was because WAX did not have enough advisory tokens to honor that obligation.  Plaintiffs understood CasSelle to be saying that at the time of the issuance of the WAX Tokens following the six-month lockup period, WAX did not expect to have enough WAX Tokens to honor all of its obligations.

33.     CasSelle also told Maloney that Defendants expected VestChain (through Maloney) to continue to provide additional consulting services as part of the consideration for the amounts previously invoiced.  Maloney is and has always been prepared to provide the same.

34.     Based on CasSelle's reassurances to Maloney, Maloney continued for a few more months to make himself available to provide services upon request to Defendants.  Plaintiffs also delayed seeking collection on the First or Second Invoice, based on CasSelle's October 2017 written approval of the First Invoice (**Exhibit E**), and his December 2017 reiteration that WAX would honor the full amount of the First Invoice.

35.     On January 10, 2018, Maloney sent an email to CasSelle in which he referenced the December 2017 conversation: "Following up on our conversation, I'm looking to confirm the token allocations invoiced to WAX previously, as well as check on the status of my invoiced charges and expenses. First, I expect that my allocated tokens will follow the WAX 10: 1 split,

correct? Second, I submitted two invoices (on October 3 and November 15, 2017) for the following token amounts. Can you please confirm that you received these invoices, and let me know when and how the proposed allocation will be made?"  A copy of this email is attached hereto as **Exhibit H** and incorporated herein.

36.     CasSelle refused to engage further with Maloney, and instead referred Maloney to Defendants' counsel.

37.     On March 5, 2018, Maloney made one final attempt to resolve these issues, by email to William Quigley, CEO of Opskins and WAX, explaining everything that had transpired. Mr. Quigley responded on March 9, 2018 with an email in which he stated: "you have been fully paid for your services."  A copy of this email exchange is attached hereto as **Exhibit I** and incorporated herein.

38.     Defendants paid the $27,000 invoiced in the First Invoice, but they have not paid the $22,983.43 invoiced in the Second Invoice, or any portion of the WAX Tokens invoiced in the either the First or Second Invoice.  Indeed, Defendants have expressly refused to do so.

39.     Counsel for Defendants and Plaintiffs engaged in efforts to settle the matter. These efforts ended without success on May 14, 2018, with Defendants' final offer to pay Plaintiffs <u>less than 1%</u> of the amounts owed on the First and Second Invoices, or even of the amounts owed on the First Invoice that CasSelle approved in writing.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Breach of Contract)**

40.     Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained above as though the same were set forth herein.

41.     Defendants hired Maloney to provide advisory services to them, and they agreed to pay Plaintiffs a combination of cash and WAX Tokens for each hour of advisory services that

8

Maloney provided.

42.     Maloney, acting on behalf of VestChain, provided 190 hours of service to Defendants during the months of August, September and October 2017.

43.     Plaintiffs invoiced Defendants for the services they provided in accordance with the WAX Agreement.

44.     In October 2017, Defendants approved the First Invoice (covering the period August 28 through September 30, 2017) in writing, via email from CasSelle to Maloney.

45.     In December 2017, Defendants reiterated that they would pay the First Invoice in full and that they wished to reach a compromise with VestChain on the Second Invoice, as communicated by CasSelle to Maloney.

46.     Beginning in January 2018, however, Defendants changed their position on both the First Invoice and Second Invoice, ultimately offering to pay less than 1% of the amounts owed.

47.     To date, Defendants have not paid the WAX Token portion of the First Invoice, or the cash portion or WAX Token portions of the Second Invoice.

48.     Defendants are in material breach of the WAX Agreement for not paying and for refusing to pay Plaintiffs the 7,538,435.4 (after 10:1 split) WAX Tokens due under the First Invoice.

49.     Defendants are material breach of the WAX Agreement for not paying and for refusing to pay Plaintiffs the $22,983.43 due under the Second Invoice

50.     Defendants are in material breach of the WAX Agreement for not paying and for refusing to pay Plaintiffs the 4,450,570 (after 10:1 split) WAX Tokens due under the Second Invoice.

51.     Defendants are in material breach of the WAX Agreement for their unilateral and unlawful decision to stop engaging the services of Maloney/VestChain, and to stop compensating Plaintiffs in accordance with the WAX Agreement.

52.     Plaintiffs have been damaged by Defendants' willful material breaches of the WAX Agreement by an amount to be determined at trial that is, upon information and belief, well in excess of $2,750,000, and potentially significantly higher, depending on the fluctuating price of WAX Tokens.

**AS AND FOR A SECOND CAUSE OF ACTION**
**(Repudiation of Contract)**

53.     Plaintiffs repeat, reallege and incorporate herein by reference each and every allegation contained above as though the same were set forth herein.

54.     Defendants hired Maloney to provide advisory services to them, and they agreed to pay Plaintiffs a combination of cash and WAX Tokens for each hour of advisory services that Maloney provided.

55.     Maloney, acting on behalf of VestChain, provided 190 hours of service to Defendants during the months of August, September and October 2017.

56.     Plaintiffs invoiced Defendants for the services they provided in accordance with the WAX Agreement.Defendants have told Plaintiffs that once they begin issuing WAX Tokens (or the remaining WAX Tokens), it will not be paying Plaintiffs the WAX Token portions of the First or Second Invoices.

57.     Defendants have also told VestChain that once they begin issuing WAX Tokens, they will not be honoring their commitment and obligation to pay Plaintiffs the WAX Tokens based on the announced 10:1 split.

58.     Defendants are in material breach of the WAX Agreement for their repudiation of

their obligation to pay Plaintiffs the 7,538,435.4 (after 10:1 split) WAX Tokens due under the First Invoice.

59.     Defendants are in material breach of the WAX Agreement for their repudiation of their obligation to pay Plaintiffs the 4,450,570 (after 10:1 split) WAX Tokens due under the Second Invoice.

60.     Plaintiffs have been damaged by Defendants' repudiation of the WAX Agreement by an amount to be determined at trial that is, upon information and belief, well in excess of $2,750,000, and potentially significantly higher, depending on the fluctuating price of WAX Tokens.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Unjust Enrichment)

61.     Plaintiffs repeat and reallege each and all of the allegations above as if they were fully set forth herein.

62.     Plaintiffs plead this Count in the alternative to the First and Second Causes of Action.

63.     Defendants requested, and Planitiffs provided, the valuable consulting services of Maloney to Defendants.

64.     Maloney, acting on behalf of VestChain, provided 190 hours of service to WAX during the months of August, September and October 2017.

65.     Upon information and belief, the services provided to by Plaintiffs have resulted in substantial revenues to Defendants that they would not have received but for the services Plaintiffs provided.

66.     By reason of the foregoing, Defendants wrongfully procured and received the services provided by Plaintiffs, wrongfully accepted the benefits of those services, and

Defendants have been, and continue to be, unjustly enriched from such services and value to which they are not entitled, to the detriment of Plaintiffs.

67.     Plaintiffs have been damaged by Defendants' wrongful actions in an amount to be determined at trial that is, upon information and belief, well in excess of $2,750,000, and potentially significantly higher, depending on the fluctuating price of WAX Tokens.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Quantum Meruit)

68.     Plaintiffs repeat and reallege each and all of the allegations above as if they were fully set forth herein.

69.     Plaintiffs plead this Count in the alternative to the First and Second Causes of Action.

70.     Plaintiffs, acting in good faith, provided valuable services to WAX.   Maloney, acting on behalf of VestChain provided 190 hours of service to Defendants during the months of August, September and October 2017.

71.     Defendants accepted the services rendered by Maloney on behalf of VestChain.

72.     Defendants acted upon and benefitted from the services provided by Plaintiffs.

73.     Plaintiffs provided these services in reliance on Defendants' promises that Plaintiffs would be compensated in cash and WAX Tokens for each hour's worth of services provided.

74.     Plaintiffs reasonably and foreseeably expected to be compensated for the services rendered to Defendants.

75.     The reasonable value of the services rendered to Defendants is reflected – at minimum – in the First and Second Invoices.

76.     Plaintiffs have been damaged by Defendants' wrongful actions in an amount to be

12

determined at trial that is, upon information and belief, well in excess of $2,750,000, and

potentially significantly higher, depending on the fluctuating price of WAX Tokens.

**AS AND FOR A FIFTH CAUSE OF ACTION**
**(Fraud in the Inducement)**

77.     Plaintiffs repeat and reallege each and all of the allegations above as if they were

fully set forth herein.

78.     Plaintiffs plead this Count in the alternative to Count One.

79.     Defendants induced Plaintiffs to provide services to Defendants, by promising to

compensate Plaintiffs with cash and WAX Tokens.

80.     Plaintiffs agreed to provide the services in express reliance on Defendants'

promises.

81.     Upon information and belief, at the time that Defendants made their promises to

Plaintiffs, Defendants had no intention of living up to those promises, and in fact knew that they

would not fulfill its promises to Plaintiffs.

82.     Had Plaintiffs known that Defendants would not live up to their promises,

Plaintiffs would not have provided the services to Defendants.

83.     Defendants never compensated Plaintiffs for the value of the services they

provided to Defendants (beyond the cash component of the First Invoice).

84.     Because Defendants did not provide what was promised, and upon information

and belief Defendants knew from the outset that they would never provide what they had

promised, Defendants committed fraud, and should be estopped from enjoying the benefits of

their wrongdoing.

85.     Plaintiffs have been damaged by Defendants' wrongful actions in an amount to be

determined at trial that is, upon information and belief, well in excess of $2,750,000, and

potentially significantly higher, depending on the fluctuating price of WAX Tokens.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Injunctive Relief)

86.     Plaintiffs repeat and reallege each and all of the allegations above as if they were fully set forth herein.

87.     Upon information and belief, Defendants are preparing to issue WAX Tokens on or about June 18, 2018.

88.     Plaintiffs believe that Defendants owe them 11,989,005.40 WAX Tokens, but Defendants have told Plaintiffs that they have no intention to honor any significant portion of that obligation.

89.     Plaintiffs are concerned that if Defendants are allowed to issue WAX Tokens on June 18, 2018, they will not only fail to pay Plaintiffs what they are owed, but Defendants will issue so many WAX Tokens to others that fewer than 11,989,005.40 WAX Tokens will remain for distribution to Plaintiffs, should they prevail in this action.

90.     Plaintiffs therefore seek injunctive relief from this Court to prevent any upcoming distribution of WAX Tokens to anyone until Plaintiffs' rights can be determined. In the alternative, Plaintiffs seek injunctive relief from this Court to prevent any distribution of WAX Tokens that would prevent Defendants from being able to issue 11,989,005.40 WAX Tokens to Plaintiffs.

91.     Defendants' actions described above have already irreparably damaged Plaintiffs, by failing to Plaintiffs the substantial outstanding amounts that Defendants owe.

92.     Furthermore, Defendants are poised to substantially damage Plaintiffs further by issuing WAX Tokens without issuing to Plaintiffs the 11,989,005.40 WAX Tokens that Defendants agreed to issue, and by issuing so many WAX Tokens that Defendants would be

unable to issue to Plaintiffs the 11,989,005.40 WAX Tokens they agreed to issue, once Plaintiffs' rights are determined in this action.

93.     Monetary damages alone will not adequately redress the above ongoing wrongful acts of the Defendants, and Plaintiffs will continue to be irreparably damaged unless Defendants are enjoined from issuing the WAX Tokens and funds that they would have used to honor their obligations to Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against each of the Defendants as follows:

a.     On the First Cause of Action, judgment against each Defendant in an amount to be determined at trial, but in any event no less than $2,750,000;

b.     On the Second Cause of Action, judgment against each Defendant in an amount to be determined at trial, but in any event no less than $2,750,000;

c.     On the Third Cause of Action, judgment against each Defendant in an amount to be determined at trial, but in any event no less than $2,750,000;

d.     On the Fourth Cause of Action, judgment against each Defendant in an amount to be determined at trial, but in any event no less than $2,750,000;

e.     On the Fifth Cause of Action, judgment against each Defendant in an amount to be determined at trial, but in any event no less than $2,750,000;

f.     On the Sixth Cause of Action, temporary, preliminary and permanent injunctive relief to prevent Defendants from issuing any WAX Tokens until Plaintiffs' rights are determined, or from issuing so many WAX Tokens that they will be unable to fulfill their obligations to Plaintiffs;

g.      For exemplary and punitive damages against each Defendant in an amount

as a jury may determine to halt such conduct;

h.      Pre-judgment and post judgment interest;

i.      Attorneys' fees; and

j.      The costs and disbursement of this action, together with such other and

further relief as this Court deems just and proper.


## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial

by jury as to all issues triable by jury, as enumerated and set forth in more detail in this

Complaint.

Dated: New York, New York
       June 12, 2018


                                        PARNESS LAW FIRM, PLLC

                                        By:_____/s/ Hillel I. Parness_____
                                        Hillel I. Parness
                                        136 Madison Ave., 6th Floor
                                        New York, New York  10016
                                        (212) 447-5299
                                        hip@hiplaw.com
                                        *Attorneys for Plaintiffs*